IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION


BARRY WAYNE FLEMON, JR.                                          PLAINTIFF


v.                              NO. 3:16-cv-00342 PSH


NANCY A. BERRYHILL, Acting Commissioner                          DEFENDANT
of the Social Security Administration


<u>MEMORANDUM OPINION AND ORDER</u>


        Plaintiff Barry Wayne Flemon, Jr., ("Flemon") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the pleading, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

        Flemon maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole.[1] Flemon specifically maintains that his residual functional capacity was erroneously assessed and offers two reasons why. First, the ALJ erred when he rejected the opinions of Dr. Stephen Woodruff, M.D., ("Woodruff"). Second, the ALJ's credibility analysis was inadequate because he did not engage in a detailed credibility analysis, gave no consideration to Flemon's work history, and ignored medical evidence that was consistent with Flemon's subjective complaints.

---

[1]        The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See <u>Boettcher v. Astrue</u>, 652 F.3d 860, 863 (8th Cir. 2011).

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). In making the assessment, the ALJ is required to consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. See Choate v. Barnhart, 457 F.3d 865 (8th Cir. 2006). The ALJ may discount a treating physician's medical opinions if other medical assessments are supported by better or more thorough medical evidence or where the treating physician renders inconsistent opinions that undermine the credibility of his opinions. See Id.

The ALJ must evaluate the claimant's subjective complaints as a part of assessing his residual functional capacity. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by considering all of the evidence, including the following:

> ... [the] objective medical evidence, the claimant's work history, and evidence relating to the factors set forth in Polaski v. Heckler, 739 F.3d 1320, 1322 (8th Cir. 1984): (i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions. ... An ALJ need not expressly cite the Polaski factors when ... [he] conducts an analysis pursuant to 20 C.F.R. 416.929 because the regulation "largely mirror[s] the Polaski factors." Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007); see 20 C.F.R. 416.929(c)(3)(i)-(iv), (vii) (2011) ...

See Vance v. Berryhill, 2017 WL 2743089, 4 (8th Cir. June 27, 2017).

2

Flemon alleged in his application for disability insurance benefits that he became disabled beginning on September 12, 2014. He alleged that he became disabled as a result of impairments that include cervical disc disease, bilateral shoulder impingement syndrome, rotator cuff tear, osteoarthritis, rupture of the left bicep tendons, and right shoulder rotator cuff tendonitis. He ably summarized the evidence in the record, and the Commissioner did not place the summary in dispute. The Court accepts the summary as a fair summation of the evidence. The summary will not be reproduced, save to note matters germane to the issues raised in the parties' briefs.

On September 5, 2013, or one year before the alleged onset date, an MRI of Flemon's cervical spine was performed. The results revealed the following: "multilevel degenerative changes which are worst on the left at the C4-C5 level where there is severe left foraminal narrowing." See Transcript at 555.

On October 9, 2013, Flemon was seen for complaints of neck pain by Dr. Robert Abraham, M.D., ("Abraham"). See Transcript at 552-554. Flemon reported that the pain began in his neck, radiated to his left shoulder, went down the posterior aspect of his left arm, and stopped at his elbow. He reported taking six Percocets a day and muscle relaxers to help ease the pain. His history was recorded, and it reflects the following: "… Flemon is a 45 year old electrician that returns to the clinic today after undergoing an MRI of his cervical spine. He has previously had an ACDF [i.e., anterior cervical discectomy and fusion] of C3-4, C5-6 in [December] of 2011. He also had a TDR [i.e., total disc replacement] in C6-7 done by Dr. Tonymon." See Transcript at 552. Abraham's diagnoses included cervical radiculopathy. Abraham continued Flemon on

medication, counseled against strenuous activity, and referred him for pain management.

Flemon thereafter saw Dr. Mark Wendell, M.D., ("Wendell") and Melanie New, APRN, ("New") for pain management on what appears to have been twenty-five occasions. See Transcript at 370-377 (01/13/2014), 378-379 (01/28/2014), 361-365 (02/10/2014), 517-521 (03/06/2014), 366-367 (03/11/2014), 509-513 (03/24/2014), 347-351 (05/05/2014), 352-353 (05/27/2014), 454-458 (06/25/2014), 421-422 (08/18/2014), 405-406 (08/26/2014), 428-429 (09/10/2014), 591-593 (12/01/2014), 626-627 (12/09/2014), 655 (12/20/2014), 705-706 (05/13/2015), 634-635 (06/02/2015), 711-712 (06/08/2015), 723-725 (08/06/2015), 636-637 (08/10/2015), 727-728 (08/24/2015), 728-731 (09/09/2015), 757-758 (09/28/2015), 747-750 (10/12/2015), 753-754 (12/29/2015). At the initial presentation, Wendell's diagnoses included cervical disc degeneration. Wendell continued Flemon on medication and began treating him with steroid injections. Flemon initially reported excellent results from the injections but later reported that they were proving to be less beneficial. An MRI of Flemon's cervical spine was performed at New's request on September 3, 2015. See Transcript at 639-640. The results revealed, in part, the following: "[d]egenerative disc changes at C4-5 caused mild central canal stenosis. Left uncovertebral osteophyte causes moderate left neuroforaminal narrowing."

Flemon returned to Abraham on July 30, 2014. See Transcript at 443-446. Flemon reported tremendous benefit from the steroid injections, but the pain in his neck and left arm returned once the effect of the medication subsided. Flemon reported that his pain was exacerbated by activity. He reported that he was considering applying for

4

disability. Abraham again diagnosed, inter alia, cervical radiculopathy, continued Flemon on medication, and continued to recommend pain management.

Flemon saw Woodruff between 2013 and 2015 and appears to have seen him on approximately eight occasions. See Transcript at 382-385 (11/12/2013), 522-527 (03/05/2014), 447-451 (07/22/2014), 443-446 (07/30/2014), 593-594 (12/03/2014), 655-657 (01/02/2015), 694-696 (04/01/2015), 742-747 (10/01/2015). At the initial presentation, Flemon complained of a constant burning in his neck and radiculopathy in his left arm. Woodruff diagnosed cervical radiculopathy and a "post-surgical state," see Transcript at 385, and prescribed a fentanyl transdermal patch. At subsequent presentations, Flemon continued to complain of pain in his neck and left arm. He also complained of pain in his right shoulder, chronic bursitis in his hips, and complications associated with low iron. Woodruff continued to diagnose cervical radiculopathy and additionally diagnosed conditions that include cervical disc degeneration, a bulging cervical disc, osteoarthritis, trochanteric bursitis, and anemia. In the July 22, 2014, progress note, Woodruff opined that he did not believe Flemon was "capable of working any … occupation with the cervical spine condition." See Transcript at 447. In the December 3, 2014, progress note, Woodruff opined that Flemon was "[u]nable to work." See Transcript at 594.

On December 3, 2014, Woodruff prepared a medical source statement-physical on behalf of Flemon. See Transcript at 564-565. In the statement, Woodruff represented that Flemon could lift and/or carry less than ten pounds frequently and occasionally but could stand and/or walk and sit for a total of eight hours. Woodruff represented that Flemon had a limited ability to push and pull because of cervical radiculopathy

with marked tricep weakness and could only occasionally perform such tasks as reaching, handling, and fingering.

On August 21, 2015, Woodruff authored a "To Whom It May Concern" letter on behalf of Flemon. In the letter, Woodruff represented the following:

> Barry Flemon has been a patient at NEA Baptist clinic over a number of years. His primary problem is [c]ervical disc disease. He has had previous cervical [s]urgery with a fusion but continues to have [s]ignificant pain in the cervical region. With radiation to the shoulders and the arms. This has greatly restricted his work as an electrician and in fact he now cannot work in any capacity. He has chronic severe pain requiring narcotic use and he has [o]ngoing arm weakness as a result of this process. This has been a problem in spite of previous surgery. In my opinion he is totally disabled with this process. …

See Transcript at 629.[2]

Flemon underwent other testing and sought other treatment during the relevant period. A December 10, 2013, cervical myelogram revealed spinal stenosis with mild anterior thecal sac compression at C3-C4 and C4-C5. See Transcript at 389. A CT scan of his cervical spine performed the same day revealed "multilevel abnormalities with

---

[2]    As a part of Flemon's request for review, he submitted a second medical source statement-physical from Woodruff. See Transcript at 20-21. In the March 1, 2016, statement, Woodruff represented, in part, that Flemon could stand and/or walk and sit for less than two hours in an eight hour workday and was unable to reach or handle. Woodruff opined that Flemon would need frequent, longer than usual breaks and would require a sit/stand option.

Flemon also submitted a medical source statement-mental from Woodruff. See Transcript at 23-24. In the March 1, 2016, statement, Woodruff represented that Flemon had several extreme limitations of function. Woodruff opined that Flemon was "not able to hold [a] full time job in his occupation at all." See Transcript at 24.

Flemon also submitted a second "To Whom It May Concern" letter from Woodruff. In the May 3, 2016, letter, Woodruff recounted Flemon's impairments and opined that he was "unable to [w]ork at any occupation in his present condition" and was unlikely to "perform full-time work of any sort in the future." See Transcript at 9.

The Appeal Council acknowledged receipt of the medical source statements and the "To Whom It May Concern" letter but gave them no consideration. The Appeals Council did so because the submissions were "about a later time" and did not "affect the decision about whether [Flemon] were disabled beginning on or before February, 19, 2016." See Transcript at 2.

disc osteophyte on the left at C4-C5 causing severe left foraminal narrowing." See Transcript at 386.

Flemon sought medical attention for his arm and shoulder pain on October 31, 2014. See Transcript at 586-591. An examination showed some positive impingement and mild weakness, but he was observed to have a full range of motion. A physician's assistant also noted the following: "[Flemon] states that [at] his next visit he may be ready to discuss left shoulder arthroscopy for rotator cuff repair as he may be done hunting." See Transcript at 590.

Flemon saw Dr. Jason Brandt, M.D., ("Brandt") on December 15, 2014. See Transcript at 612-616. Brandt diagnosed, in part, a right rotator cuff tear and left shoulder impingement syndrome. Brandt recommended that Flemon undergo a right shoulder arthroscopic rotator cuff repair.

Brandt performed the right shoulder arthroscopic rotator cuff repair on January 15, 2015. See Transcript at 608-610. Flemon healed well following the surgery, particularly after he received a period of physical therapy. See Transcript at 657-661, 662-666, 667-680, 684-694. By February 22, 2015, he was observed to have a full range of motion in his right shoulder. See Transcript at 684.

On April 23, 2015, Brandt performed arthroscopic surgery on Flemon's left shoulder. See Transcript at 631-634. Flemon healed well following the surgery, see Transcript at 696-700, 706-710, and by July 24, 2015, he was observed to have a full range of motion in his left shoulder. See Transcript at 713-717.

On September 3, 2015, another MRI of Flemon's cervical spine was performed. The results showed, in part, the following: "[d]egenerative disc changes at C4-5

caus[ing] mild central canal stenosis" and "[l]eft uncovertebral osteophyte caus[ing] moderate left neuroforaminal narrowing." <u>See</u> Transcript at 555.

The record contains a history of Smith's FICA earnings for the years 1985 through 2014. <u>See</u> Transcript at 200. The summary reflects that he had substantial earnings during that period, particularly between the years 1996 and 2014.

Flemon completed a series of documents in connection with his application for disability insurance benefits. <u>See</u> Transcript at 236-243, 244-245, 246-253, 284, 286. In the documents, he represented that he worked as an electrician from October of 1993 through September of 2014. He experiences pain in his neck and left arm. He can stand/walk and sit for approximately one hour before he begins to experience pain, and the pain is exacerbated by physical activity. Flemon can attend to his own personal care, prepare his own meals, and perform some house and yard work. He can shop and does so once a week. His hobbies include watching television, reading, and hunting, although he no longer hunts. His social activities include attending church once a week.

Flemon testified during the administrative hearing. <u>See</u> Transcript at 98-110. He was forty-eight years old at the time. He completed high school and a five year apprenticeship. He lives with his wife and helps out around the house. He has difficulty performing activities involving the use of his shoulders and arms and was told to not lift more than ten pounds at one time. He takes Oxycodone and Risperdal for his pain. Although Flemon can reach over his head, he begins to experience pain when he lifts weight over his head or reaches over his head repeatedly. He worked as a journeyman electrician for approximately twenty years and last worked in September of 2014. He stopped working because of the pain in his neck. He does not believe he can work a job

requiring him to stand/walk or sit for six hours during a workday or a job requiring him to use his arms and hands repeatedly.

The ALJ found at step two that Flemon has severe impairments in the form of "cervical disc disease; bilateral shoulder impingement syndrome, rotator cuff tear, osteoarthritis; rupture of the left biceps tendon; and right shoulder rotator cuff tendonitis." See Transcript at 83. The ALJ assessed Flemon's residual functional capacity and found that he can perform sedentary work "except he can perform occasional overhead reaching bilaterally; occasional handling with the non-dominant upper extremity; and occasional stooping, crouching, crawling, and kneeling." See Transcript at 84. In making the foregoing findings, the ALJ noted Woodruff's December 3, 2014, medical source statement-physical and his August 21, 2015, "To Whom It May Concern" letter and accorded the opinions contained in those documents the following weight:

> … While the undersigned notes an opinion on whether an individual is disabled goes to an issue reserved to the Commissioner and therefore cannot be given special significance, such opinion should still be considered in the assessment of the claimant's residual functional capacity … The undersigned affords the treating physician's opinion partial weight as it is supported by the claimant's diagnosis of cervical disc disease, which results in decreased range of motion and requires ongoing pain management. … However, the physician's opinion is inconsistent with the claimant's report that he benefits from pain medication, including steroid injections, as well as refraining from reaching overhead. …

See Transcript at 88.

Flemon first maintains that the ALJ erred when he rejected Woodruff's opinions. It is Flemon's position that the ALJ's reasons for discounting the opinions, i.e., they

were inconsistent with Flemon's testimony, are specious. Flemon maintains instead that the opinions are consistent with the record as a whole.

"In deciding whether a claimant is disabled, the ALJ considers medical opinions along with 'the rest of the relevant evidence' in the record." See Wagner v. Astrue, 499 F.3d at 848 [quoting 20 C.F.R. 404.1527(b)]. "[W]hether the ALJ grants a treating physician's opinion[s] substantial or little weight, the regulations ... provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) [quoting 20 C.F.R. 404. 1527(d)(2)].

Clearly, Woodruff was a treating physician. His opinions regarding Flemon's physical limitations were therefore entitled to great weight, assuming of course that they were well-supported by medically acceptable clinical and laboratory diagnostic techniques and were not inconsistent with the other substantial evidence. The ALJ did not discount Woodruff's opinions because they were not well-supported by medically acceptable clinical and laboratory diagnostic techniques. In fact, the ALJ specifically found that Woodruff's opinions were supported by the medical evidence, specifically, by evidence of Flemon's cervical disc disease and the work-related limitations it causes. The ALJ instead discounted Woodruff's opinions because they were inconsistent with the other substantial evidence. What other substantial evidence did the ALJ rely upon in discounting the opinions? The ALJ relied upon Flemon's self-reports that he benefits from pain medication, including steroid injections, and by refraining from reaching overhead. Although the ALJ could certainly consider Flemon's self-reports, the Court is not persuaded that the self-reports, standing alone, are adequate other substantial

evidence to undermine Woodruff's opinions. In that regard, the Court adopts the following representations made by Flemon in his brief:

> … while Flemon may well benefit from treatment, this does not serve to discredit … Woodruff's opinion about [Flemon's] ability to work; to the contrary, as careful consideration of … Woodruff's opinion would have shown, Flemon's medical records indicate that his pain increased when he returned to work, that the relief he received from the injections was only partial and that he thought they were no longer helping him, and that he believed his neck pain was worsening.

See Docket Entry 10 at CM/ECF 22.

The Commissioner offers several additional reasons why the ALJ could have discounted Woodruff's opinions, e.g., Flemon continued to work as an electrician until September of 2014 and "arthroscopic surgeries were successful and medication controlled his pain," see Docket Entry 15 at CM/ECF 15. The task of assigning weight to medical opinions, and the task of offering reasons for discounting those opinions, is for the ALJ at the administrative level, not for the Commissioner at the judicial level. It may be that Woodruff's opinions are eventually discounted, but the ALJ must offer good reasons for doing so and the reasons must be supported by substantial evidence on the record as a whole. A remand is therefore warranted so that the ALJ can re-evaluate Woodruff's opinions.

Flemon offers a second reason why the ALJ findings are not supported by substantial evidence on the record as a whole. Flemon maintains that the ALJ's credibility analysis was inadequate because he did not engage in a detailed credibility analysis, gave no consideration to Flemon's work history, and ignored medical evidence that was consistent with Flemon's subjective complaints. The Court will not devote much attention to Flemon's assertion, save to note that the ALJ's credibility analysis

was minimal. Upon remand, the ALJ shall re-evaluate Flemon's credibility, giving specific consideration to such factors as his exceptional work history.

Substantial evidence on the record as a whole does not support the ALJ's assessment of Flemon's residual functional capacity. A remand is necessary. Upon remand, the ALJ shall re-evaluate Woodruff's opinions and Flemon's credibility.

The Commissioner's decision is reversed, and this case is remanded. The remand in this case is a "sentence four" remand as that phrase is defined in 42 U.S.C. 405(g) and Melkonyan v. Sullivan, 501 U.S. 89 (1991). Judgment will be entered for Flemon.

IT IS SO ORDERED this 24th day of July, 2017.


_____
UNITED STATES MAGISTRATE JUDGE